Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Settlement Class Counsel*

Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com
Mark S. Reich (*pro hac vice*)
mreich@zlk.com
Levi & Korsinsky LLP
55 Broadway
4th Floor, Suite 427
New York, NY 10006
Tel: 212-363-7500
Fax: 212-363-7171

*Settlement Liaison Counsel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, | CASE NO.: 3:21-cv-03943-WHO |
| *Plaintiff,* | **PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND A SERVICE AWARD** |
| v. | |
| ROBLOX CORPORATION, | Date: September 27, 2023 |
| *Defendant.* | Time: 2:00pm<br>Judge: William H. Orrick<br>Courtroom: 2, 17th Floor |

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 3

III.  ARGUMENT ........................................................................................................... 5

    A.    The fee award is not governed by 28 U.S.C. § 1712. ................................... 6

        1.    This is not a coupon settlement. ....................................................... 6

            a.    Class members need not spend more money to benefit from Robux relief. ...................................................................... 6

            b.    There are no special conditions or limitations placed on the Robux that will be made available to Class Members. .................................. 8

            c.    Robux relief will not expire. .................................................. 9

        2.    Even if this is a coupon settlement, the redemption rate should be near 100%. ............................................................................................. 10

    B.    The Court should issue a benchmark fee award of 25% of the fund, or, considering all of the relief, just 5.4% of the value to the Class. ......................... 11

        1.    The results achieved here, both monetary and non-monetary, justify a benchmark fee award, particularly in light of the litigation risks faced in this case. .......................................................................................... 12

        2.    A lodestar cross check supports the requested fee. ........................... 14

    C.    Settlement Class Counsel's expenses are reasonable. ........................................ 16

    D.    The Court should issue the requested service award. ......................................... 16

IV.   CONCLUSION ....................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages(s)**

*Acosta v. Frito-Lay, Inc.*,
    No. 15-CV-02128-JSC, 2018 WL 646691 (N.D. Cal. Jan. 31, 2018)...............................16

*Bellinghausen v. Tractor Supply Co.*,
    306 F.R.D. 245 (N.D. Cal. 2015) ......................................................................................14

*Chambers v. Whirlpool Corp.*,
    980 F.3d 645 (9th Cir. 2020) .................................................................................8, 9, 11

*In re Easysaver Rewards Litig.*,
    906 F.3d 747 (9th Cir. 2018) ...................................................................................3, 6, 7

*In re Bluetooth Headset Prods. Liability Litig.*,
    654 F.3d 935 (9th Cir. 2011) ...........................................................................................11, 12

*In re Facebook Biometric Info. Priv. Litig.*,
    522 F. Supp. 3d 617 (N.D. Cal. 2021) ...............................................................................15

*In re High-Tech Employee Antitrust Litig.*,
    No. 11-CV-02509-LHK, 2015 WL5158730 (N.D. Cal. Sept. 2, 2015) ...........................16

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) ....................................................................................15, 16

*In re Korean Air Lines Co, Ltd. Antitrust Litig.*,
    No. CV 07-05107 SJO AGRx, 2013 WL 7985367 (C.D. Cal. Dec. 23, 2013)................12

*In re Lenovo Adware Litig.*,
    No. 15-MD-02624-HSG, 2019 WL 1791420 (N.D. Cal. Apr. 24, 2019) ........................13

*In re Lidoderm Antitrust Litig.*,
    No. 14-MD-02521-WHO, 2018 WL 4620695 (N.D. Cal. Sept. 20, 2018)......................12

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices &
Prods. Liab. Litig.*,
    27 F.4th 291 (4th Cir. 2022) ............................................................................................15

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................14

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ..................................................................................*passim*

*In re Optical Disk Drive Prods. Antitrust Litig.*,
    959 F.3d 922 (9th Cir. 2020) .......................................................................................5, 12

*Juarez v. Social Fin., Inc.*,
  No. 20-CV-03386-HSG, 2023 WL 3898988 (N.D. Cal. June 8, 2023) ........................... 17

*Laffitte v. Robert Half Int'l Inc.*,
  1 Cal. 5th 480 (2016) ..................................................................................... 12, 14

*Lowery v. Rhapsody Int'l, Inc.*,
  69 F.4th 994 (9th Cir. 2023) .......................................................................... 11

*McKinney-Drobnis v. Oreshack*,
  16 F. 4th 594 (9th Cir. 2021) ....................................................................... 8, 9

*McKnight v. Hinojosa*,
  54 F.4th 1069, (9th Cir. 2022) ................................................................. 6, 7, 8, 9

*Moreno v. S.F. Bay Area Rapid Transit Dist.*,
  No. 17-CV-0211-JSC, 2019 WL 343472 (N.D. Cal. Jan. 28, 2019) ............................... 15

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................................ 17

*Seegert v. Lamps Plus, Inc.*,
  377 F. Supp. 3d 1127 (S.D. Cal. 2018) ............................................................. 9

*Smith v. Costa Del Mar, Inc.*,
  No. 3:18-CV-1011-TJC-JRK, 2021 WL 4295282 (M.D. Fla. Sept. 21, 2021) ................ 15

*Sullivan v. Dolgen Caifornia, LLC*,
  No. 3:15-CV-01617-JD, 2017 WL 3232540 (N.D. Cal. July 31, 2017) ........................ 16

*Vianu v. AT&T Mobility LLC*,
  No. 19-CV-03602, 2022 WL 16823044 (N.D. Cal. Nov. 8, 2022) ........................... 12, 13

*Vincent v. Hughes Air W., Inc.*,
  557 F.2d 759 (9th Cir. 1977) ........................................................................ 16

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .................................................................. 12, 13, 14

*Wininger v. SI Mgmt. L.P.*,
  301 F.3d 1115 (9th Cir. 2002) ...................................................................... 16

**Statutes**

28 U.S.C. § 1712 ..................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 23 .................................................................................... 11

## I.       INTRODUCTION

This case concerns the application of established consumer protection laws to a new context: one of the largest virtual worlds in existence, Roblox.  The denizens of this world are mostly children.  They partake in a bustling economy within the Roblox metaverse.  That economy runs on "Robux," a digital currency that users must purchase to engage in the mountains of microtransactions that have made Roblox so successful.

At issue in this case was one thriving segment of the Roblox economy that involves the creation and sale of digital items used to customize a user's avatar.  An avatar is the image a user projects of themselves to others in Roblox's virtual world.  These digital items vary dramatically in cost, ranging from just a few Robux (mere cents) to more expensive exclusive items on the order of tens of thousands of Robux.  The vast majority, however, are inexpensive, on the order of cents to a few dollars.

Plaintiff Jane Doe, a twelve-year-old girl at the outset of this case, alleged that Roblox, under the guise of "content moderation," indiscriminately deleted items sold on the marketplace to juice demand for Robux.  She bought jeans and pajamas for her avatar, but they were then mysteriously deleted from her account by Roblox without any refund of Robux.  Because of this scheme, users would have to spend more money to purchase Robux that could be used to replace their lost virtual items.  In simple terms, Plaintiff alleged that Roblox sought to enrich itself through a bad-faith and manipulative content moderation scheme.  Plaintiff sought to hold Roblox accountable principally under statutory and common-law fraud theories.

The factual and legal battle lines came into focus early in the case.  They centered on whether Roblox's Terms of Service successfully created any contractual obligations to arbitrate, whether Roblox's content-moderation scheme was unlawful or fraudulent, and whether Roblox users were harmed by the practices in question.  Roblox's motion required the Court to consider important questions about the reach of consumer protection laws into the metaverse, a relatively new but rapidly growing segment of the economy which has also proven extremely profitable: in the past three years alone, Roblox's revenues skyrocketed from $890 million in 2020 to over $2 billion in 2022.  Class Counsel successfully defeated Roblox's motion to dismiss, securing a

1   ruling that broke ground by affirming that Plaintiff had adequately alleged that Roblox's scheme

2   violated numerous California laws, and rejecting Roblox's argument that it had successfully

3   waived the rights of its children-customers to pursue their remedies through an inconspicuous link

4   to a largely incomprehensible terms of service agreement.

5         Thereafter, Class Counsel engaged in discovery with Roblox.  Ultimately, however, the

6   Parties came to the table to resolve the case.  Given the novel issues raised by this case and the

7   remarkably unsettled legal framework that would apply to it, Class Counsel negotiated an

8   exceptional resolution.  The centerpiece of the proposed Settlement is a $10 million fund which

9   will immediately return nearly half of the losses to virtually every single Class Member.  The

10   Settlement provides that relief automatically in the form of Robux to Settlement Class Members

11   whose share is less than $10.  These Class Members will receive what they originally wanted

12   when they gave their money to Roblox, and exactly what Plaintiff alleges was improperly taken

13   from the Class: Robux.  Class Members with a share greater than $10 have the option to obtain

14   cash in lieu of Robux, but they too will receive Robux if they do not elect for the cash option.  In

15   addition, this litigation prompted Roblox to refund more than 400 million Robux to users, or about

16   $5 million in value to the Class.  *See* Dkt. 66 at ¶ 5.  The Settlement provides important forward-

17   looking relief, too, by locking that policy in place, requiring Roblox to refund every user when an

18   item is moderated in the future.  Based on the amounts lost in the past, the value of that injunctive

19   relief can be concretely calculated and—even assuming that Roblox does not grow after 2022—

20   will save the class more than $30 million.  *See* Dkt. 66 ¶ 10.

21         For their efforts litigating this case and negotiating this excellent Settlement, Class Counsel

22   seeks an award of fees equal to the benchmark award in this Circuit: calculated just based off of

23   the fund size, Class Counsel request 25% of the fund, or $2,500,000.  Considering the injunctive

24   relief and past refunds, however, the requested fee equates to just 5.4% of the total value to the

25   Class.  As explained in detail below, the requested award would fairly compensate Class Counsel

26   for the outstanding result they achieved for the Class.  The Court should also issue a $5,000

27   service award to the Class Representative in recognition of her critical role in achieving this

28   Settlement.

1    Considering the outstanding relief, the challenges overcome in securing it, and the request

2    for a benchmark award, Class Counsel submits that much of this fee petition is straightforward.

3    The major question is the one already posed by the Court: whether a refund of the virtual currency

4    that Roblox wrongfully took from users and which users used to make purchases is a "coupon"

5    within the meaning of 28 U.S.C. § 1712.  While that question arises in novel territory, the well-

6    established body of law on coupon settlements counsels plainly against finding the relief to be a

7    coupon.  Robux are not coupons that need to be redeemed to have value, they are in-kind relief:

8    Class Members will receive precisely what they lost due to the alleged misconduct.  Moreover,

9    Robux are not good for only a handful of limited purposes, but rather can be used to buy millions

10   of items in a marketplace containing millions of sellers—a coupon this does not make.  *See In re*

11   *Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018).  Class Counsel respectfully request

12   that the Court grant the motion.

13   **II.    BACKGROUND**

14   Defendant developed Roblox in the mid-aughts, but the online game platform exploded in

15   popularity during the COVID-19 pandemic, when various shelter-in-place orders forced the

16   closure of schools and neighborhood spaces.  Roblox's virtual world became an easy outlet for

17   children.  But as more children began to occupy this online space, millions were frustrated by

18   Roblox's practice of deleting (or "moderating") virtual items they had purchased with Robux.

19   Worse, Roblox did this without providing refunds, and while pocketing its own cut of the

20   transactions.

21   Class Counsel began investigating these issues in 2020 following online complaints.

22   Investigations at Edelson PC and Levi & Korsinsky, LLP proceeded in parallel and resulted in two

23   complaints concerning Roblox's conduct, which were related on the motion of the plaintiff in the

24   later-filed action.  *See* Dkt. 14.  The complaints contended that Roblox's practice of deleting

25   purchased content on the Roblox platform was part of a fraudulent scheme to induce its minor

26   users to pay more money to Roblox.  Accordingly, they sought the return of Robux spent on

27   deleted items (or the equivalent in dollars), and an injunction.  The complaints raised claims for

28   relief under California's Unfair Competition Law and Consumer Legal Remedies Act, and under

1   common law theories of fraud, breach of implied contract, and unjust enrichment.  The later-filed

2   complaint was later dismissed without prejudice, and the lawyers agreed to cooperate in

3   prosecuting the case on behalf of the proposed Class in the instant action.

4        After the complaints were filed, in an effort to moot the litigation, Roblox announced a

5   refund program that ostensibly would cover losses from previously deleted items upon request,

6   and which would operate automatically on an ongoing basis.  Roblox then moved to dismiss the

7   complaint, *see* Dkt. 19, and Plaintiff amended as of right, *see* Dkt. 22.  Roblox quickly renewed its

8   motion to dismiss, Dkt. 25, addressing a wide range of issues to narrow or eliminate altogether

9   Plaintiff's claims.  Plaintiff filed a comprehensive response which thoroughly rebutted Roblox's

10  arguments about whether its refund program mooted all or part of the lawsuit or prevented the

11  plaintiff from litigating a UCL claim, whether the Terms of Services required the use of an

12  alternative dispute mechanism or disclosed the challenged practices (defeating any claim of fraud),

13  and whether the Communications Decency Act immunized Roblox's conduct.  *See* Dkt. 33.  In

14  responding to Roblox's mootness argument, Plaintiff worked closely with Class Counsel to

15  determine whether Roblox had provided a refund (although Roblox thought that it had, Plaintiff

16  never received Robux for her deleted items), and to investigate the mechanics and effectiveness of

17  this refund program.  Salahi Decl. ¶ 5.  The Court ultimately sided in substantial part with Plaintiff

18  in rejecting Roblox's motion to dismiss.  *See* Dkt. 48.

19       The parties thereafter came to the bargaining table, recognizing the benefits of a resolution

20  of this dispute in light of the numerous unsettled legal issues posed in the case.  Determined that

21  these discussions should bear fruit, the parties engaged the services of a third-party neutral,

22  Gregory Lindstrom, of the highly respected Phillips ADR firm.  Salahi Decl. ¶ 6.  Prior to the

23  mediation, Roblox produced, and Class Counsel scrutinized, discovery relevant to the composition

24  of any settlement class and the scope of the class's losses.  *Id.*  Following preparation of thorough

25  mediation statements, which discussed these facts and provided an in-depth discussion of the

26  applicable law, the parties engaged in a day-long, in-person mediation presided over by Mr.

27  Lindstrom.  *Id.*  Agreement in principle was not reached until late in the evening.  *Id.*

28

Despite that broad agreement, there remained several sticking points that needed to be resolved before a complete deal could be presented to the Court.  Salahi Decl. ¶ 7.  The parties worked diligently over the following weeks and months to hammer out the final details.  *Id*.  The final Settlement ensures that Class Members get back what they lost—Robux.  Because the price of Robux has fluctuated over time, and because Robux can be purchased in bundles with volume discounts, Class Counsel negotiated an exchange rate that ensures the most advantageous refund rate possible to the Class.  *Id*.  Each Class Member's share of the Settlement will be deposited directly into their Roblox account, although members of the Class who are entitled to at least $10 worth of Robux from the Settlement can choose instead to receive their share of the Settlement in cash.  In total, the value of the Settlement is $10 million, including the value of the Robux (at the negotiated exchange rate) and cash to be returned to Class Members, settlement administration costs, and any service award and awards of attorney's fees and costs.

And Class Counsel's work has not stopped.  Since agreeing to the Settlement, Class Counsel have communicated regularly with the Settlement Administrator to ensure smooth processing of the Settlement relief, and to ensure that any Class Member's questions are quickly and thoroughly answered.  Salahi Decl. ¶ 8.  Class Counsel will continue to assist in the administration of the Settlement until Settlement Class Members have received the benefits they are entitled to, and will defend the Settlement in any appeals that are filed.  *Id.*

## III.   ARGUMENT

Plaintiff now seeks attorneys' fees of $2.5 million (equal to 25% of the cash value of the $10 million Settlement Fund or 5.4%[1] of the Settlement's value to the Class overall), reimbursement of Class Counsel's expenses in the prosecution of this action, and a modest $5,000 incentive award for the Plaintiff.  In evaluating these requests, the Court "assume[s] a fiduciary role that requires close scrutiny of class counsel's requests for fees and expenses from the common fund." *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020).

---

[1] This includes the $10 million value of the Settlement Fund, the approximately $5 million worth of Robux already refunded to Class Members by Roblox in response to this litigation, and the estimated $31 million value of future injunctive relief to the Class.

Class Counsel request the benchmark fee award.  As explained below, several facts about this Settlement would warrant an above-benchmark award, rendering Class Counsel's request all the more reasonable.  Moreover, a lodestar cross-check confirms the reasonableness of Class Counsel's fee request, as a 25% award would represent a mere 3.0 multiplier on Class Counsel and Liaison Counsel's reasonable lodestar.  The Motion should be granted.

**A.      The fee award is not governed by 28 U.S.C. § 1712.**

One preliminary issue must be addressed.  This Court previously reserved decision on whether the instant Settlement is a coupon settlement subject to special rules under the Class Action Fairness Act, 28 U.S.C. § 1712, for fee calculation.  *See* Dkt. 65 at 3.  Upon further examination, the Court should conclude that this Settlement is not a coupon settlement.

**1.      This is not a coupon settlement.**

28 U.S.C. § 1712 governs fee awards in coupon settlements.  But Section 1712 does not define "coupon."  *See In re Easysaver*, 906 F.3d at 755.  The Ninth Circuit has developed a three-part test for determining whether a settlement is a coupon settlement: "(1) whether class members have to hand over more of their own money before they can take advantage of a credit, (2) whether the credit is valid only for select products or services, and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable."  *Id.* (citing *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015)).  No single factor is dispositive. *Id.*

**a.      Class members need not spend more money to benefit from Robux relief.**

"The first *Online DVD* factor focuses on whether class members receive only a discount on services and must pay more out of pocket to redeem their class benefits."  *McKnight v. Hinojosa*, 54 F.4th 1069, 1075 (9th Cir. 2022).  Courts have also looked to what types of products or services the typical award would allow class members to purchase from the defendant, and whether class members would value the relief like they would cash.  *See id.* at 1075-76.  For instance, gift cards to large retailers, which do not come with any restrictions on what type of product may be purchased, are typically not considered coupon-like relief.  *See In re Online DVD*. This is especially true when the defendant's business offers a variety of products that can be

1  purchased for less than the value of the voucher, as in *In re Online DVD*, which concerned Wal-

2  Mart.  By contrast, where a gift card or voucher would only qualify the class member to receive a

3  discount on a product, or to purchase only a "limited universe" of products, then the relief is more

4  likely to be considered a coupon.  *See In re Easysaver*, 906 F.3d at 757 (credits were only good for

5  "flowers, chocolates, and other similar gifts," and defendants only sold "15-25 products" below

6  the amount of the credit).  But even if settlement relief would only entitle a class member to a

7  discount on a particular product or service, if there is reason to believe that class members would

8  value the relief "equivalently" to cash, the relief provided by a settlement is unlikely to be

9  considered a coupon.  *McKnight*, 54 F.4th at 1076.

10         These considerations weigh against construing the relief here as coupons.  First, somewhat

11  like *McKnight*, a portion of the Settlement Class has the option of receiving their settlement

12  benefits in cash.  *Cf. id.*  To date, about 3% of those eligible for cash relief have made that

13  election, after a robust notice process with reminders to submit cash claims.[2]  That suggests, as

14  *McKnight* observed, that those who are participating in the Settlement value Robux equivalently to

15  (or in fact better than) cash.  For good reason: Robux really *are* a virtual currency.  That currency

16  is tied to a particular virtual world, but that is immaterial to most users.  Moreover, the exchange

17  rate negotiated in the Settlement is more favorable to Class Members than the exchange rate used

18  for all but the largest bundle of Robux available for purchase on the platform.  Salahi Decl. ¶ 7.  In

19  other words, Class Members get a better deal if they choose Robux than if they take cash and then

20  use it to purchase Robux on the open market.  And there are tens of thousands of virtual items

21  available for purchase for less than the typical Robux award.

22

23         [2]  Separate and apart from the Court-ordered notice program, Class Counsel have discovered
    social media coverage of the Settlement.  One Class Member created a TikTok with over 2.2
24  million views, over 273,000 "likes," over 38,000 "bookmarks," and nearly 6,000 comments,
    where she describes the features of the Settlement and emphasizes, "I'm choosing to do nothing
25  because I want just my Robux back."  *See* ecjcv, *IMPORTANT! Roblox message telling about
    class action settlement*, TikTok,  https://www.tiktok.com/@ecjcv/video/7245078775241723179.
26  A lawyer-influencer on TikTok also posted a video describing the Settlement with over 1.2
    million views, 204,000 "likes," 7,500 comments, and 35,000 "bookmarks."  *See*
27  thelawyerangela, *Get ur #roblox #robloxedit #robux #classaction #lawsuit #money
    #classactionsettlement*, TikTok (May 12, 2023),
28  https://www.tiktok.com/@thelawyerangela/video/7232396806381047086.

1   Moreover, one of the chief evils this factor seeks to protect against are coupon settlements

2   that require class members to give *more* of their money to a business with an entity that allegedly

3   harmed them in some way, as a condition of benefiting from a settlement.  *See Chambers v.*

4   *Whirlpool Corp.*, 980 F.3d 645 (9th Cir. 2020).  But that does not appear to be an impediment

5   here.  In fact, it appears that most Class Members *want* to continue to use Roblox and Robux.

6   Roblox itself already informed the Court that it would raise this issue as a defense to the merits

7   should the case proceed.  *See* Dkt. 62 at 1 ("Moreover, were this case to proceed, the facts would

8   show that class members continued to spend Robux to acquire virtual items even after they had

9   experienced moderation of an item . . . .").  In fact, data from Roblox shows that Robux tend to be

10  spent almost as soon as they are acquired.  Salahi Decl. ¶ 9.  In other words, the relief here is for

11  exactly the kind of products or services Class Members would want to acquire.  Indeed, it is the

12  same product or service that Class Members originally paid to acquire: Robux that can be spent in

13  the Roblox universe.

14          **b.      There are no special conditions or limitations placed on the
                      Robux that will be made available to Class Members.**

15          "The second *Online DVD* factor is whether the credit is valid only 'for select products or

16  services.'"  *McKnight*, 54 F.4th at 1076 (quoting *In re Online DVD*, 779 F.3d at 951).  In some

17  respects, this factor may appear to weigh slightly in favor of construing Robux relief as coupons,

18  because they can only be spent in the Roblox universe.  But the reality is that the Roblox universe

19  opens up a nearly infinite selection of things one could spend Robux on.  The Roblox Avatar Shop

20  features literally tens of thousands of products that can be obtained using the average Class

21  Member's recovery of 100 Robux.  *See* Roblox, Marketplace, https://www.roblox.com/CATALO

22  G?Category=1&CurrencyType=3&pxMax=100&salesTypeFilter=1 (last visited Jul. 26, 2023).

23  Because Robux can be used to purchase many different products and services, this type of relief,

24  in this context, is not a coupon.

25          This factor normally targets vouchers that can only be used to acquire some of the products

26  the defendant sells, like the vouchers that were only good for purchasing certain major expensive

27  appliances in *Chambers v. Whirlpool*; vouchers whose terms limit their use as a practical matter,

28  as in *McKinney-Drobnis v. Oreshack*, 16 F. 4th 594 (9th Cir. 2021), where the subject coupons

1  had to be redeemed in person but no location offered every product theoretically sold by the

2  defendant; or where the retailer sells a narrow range of products, many of which are much more

3  expensive than the value of the voucher, as in *Seegert v. Lamps Plus, Inc.*, 377 F. Supp. 3d 1127,

4  1131-32 (S.D. Cal. 2018) ($18 voucher to lighting store deemed coupon in part because $18 could

5  only purchase about 9% of defendant's narrow offerings).

6        Although in one sense the types of products one can buy with Robux are "limited" to

7  virtual goods, Roblox users do not truly experience that as a "limitation" because that is exactly

8  what they are looking for.  For Class Members immersed in this world, a nearly limitless variety

9  of items is on offer for purchase to enhance their experiences.  The Robux received through this

10 Settlement are like any other Robux; they are the currency of the land and there are no restrictions

11 on what they can be used for.[3]  In other words, for the children who inhabit the Roblox metaverse,

12 the relief here is nothing like the relief on offer in *Chambers, McKinney-Drobnis*, or *Seegert*.

13 Moreover, the fact that a certain currency can only be used in certain places does not make a

14 coupon: such a finding would implicate virtual currencies of all kinds that are accepted in only

15 certain contexts, such as Bitcoin.  And in these circumstances, the relief provided here—in-kind

16 relief (*i.e.*, restoration of the Robux that Class Members lost), without any special restrictions and

17 which can be used in a vibrant marketplace in nearly infinite ways—has real value.  A holding

18 otherwise may undermine efficient settlements because rather than give people what they lost and

19 exactly what they want, settling parties will have to create additional hoops (along with attendant

20 transaction costs) to provide something that avoids the "coupon" label.[4]

21                    **c.       Robux relief will not expire.**

22        The final *In re Online DVD* factor concerns the flexibility of the settlement relief,

23 "including whether it expires or is freely transferable."  *McKnight*, 54 F.4th at 1077.  Here, the

24 Robux offered through the Settlement do not expire.  They are also, in theory at least, freely

25 _____

26        [3]   Indeed, some people appear to be using Robux as a currency exchangeable with the real world.  *See* Preliminary Approval Brief (discussing excluded class members).

27        [4]   Unlike distributing Robux, which has very small transaction costs, distributing cash has extra transaction costs such as the cost of a check and mail, which would pose challenges for a

28 case like this where the average Class Member lost approximately $1-3.  Even online payment platforms have some attendant costs.

1    transferable (and some people are doing that for evidently real-world applications).  The Court

2    should find that this factor weighs against a finding that the Robux relief is a type of coupon.

3           In sum, the relevant factors in these circumstances weigh against a finding that this is a

4    coupon settlement, although one factor may be a closer call.  In these circumstances, the Court

5    should find that this is not a coupon settlement.  Relief in the form of a virtual currency is neither

6    inherently coupon relief or non-coupon relief; rather, each case must be evaluated on its own facts

7    and in light by the purpose of the coupon rules in 28 U.S.C. § 1712 and the concerns that

8    motivated Congress in adopting them.  As digital worlds and virtual currencies proliferate, there

9    will certainly be cases where the virtual relief purportedly provided is of questionable value.  But

10   Class Counsel respectfully submit that this is not such a case.  Class Members will obtain

11   precisely what they lost at the outset of this case: Robux they can use, and want to use, in the

12   Roblox metaverse.

13                    **2.      Even if this is a coupon settlement, the redemption rate should be near 100%.**

14          If the Court nevertheless concludes that this is a coupon settlement, then "the portion of

15   any attorney's fee award to class counsel that is attributable to the award of the coupons shall be

16   based on the value to class members of the coupons that are redeemed."  28 U.S.C. § 1712(a).

17          That raises the question: what does it mean to "redeem" a virtual currency like Robux?

18   Like real-world dollars, Robux are fungible.  They can be spent on any item in the Roblox

19   universe, and one Robux is the same as every other.  In fact, when a user spends Robux on an

20   item, they do not select any particular Robux for the transaction.  The Robux are just deducted

21   from their account balance.  (This is yet another reason why describing the relief under the

22   settlement as a coupon is a misnomer.)  For the same reason it is meaningless to say that one

23   "redeems" U.S. dollars, it is also meaningless to say that one "redeems" Robux.  Roblox users

24   obtain value from Robux as soon as they are deposited in their accounts, just as people obtain

25   value from dollars in the real world as soon as they receive them—not just when they spend them.

26   Thus, the Robux, like deposits of US Dollars in a bank account, should be treated as 100%

27   "redeemed" upon deposit.

28

Even if the Robux are "redeemed" only when they are spent, there is every reason to believe that the redemption rate here will be at or near 100%. According to data produced by Roblox, in the 6 months prior to preliminary approval (November 11, 2022 to May 11, 2023), Class Members spent nearly $289,165,119 USD on Robux across the board (not just on the moderated items at issue in this litigation), which, using a conservative conversion rate of 1 R = $0.0125, translates to approximately 23.1 billion Robux. Salahi Decl. ¶ 9. During that same period, Class Members used over 27.9 billion Robux on the platform. *Id.* That spending rate suggests that Class Members generally spend whatever Robux they have in their accounts promptly without keeping a balance. *Id.* There is no reason to think that the spending of Robux received through this settlement will be any different.

If the Court determines that this is a coupon settlement and that an evaluation of attorney's fees is not possible until it is determined how much Robux are spent by Class Members after relief is delivered through the Settlement, then the Court can and should hold back a portion of the Settlement and pay Class Counsel when information about Class Members' spending comes in. *See Chambers v. Whirlpool Corp.*, 980 F.3d at 662 (recognizing that in coupon settlements with extended redemption periods, a court may opt to pay class counsel periodically as coupons are redeemed). In the following sections, Class Counsel will discuss the fee award in terms of a percentage of the common fund, using the full $10 million value of the Settlement as the denominator. Should the Court choose to look at redemption rates, the denominator may be modified accordingly.

**B.      The Court should issue a benchmark fee award of 25% of the fund, or, considering all of the relief, just 5.4% of the value to the Class.**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Per Rule 23, the Court must ensure that any fee award is reasonable. *See Lowery v. Rhapsody Int'l, Inc.*, 69 F.4th 994, 1000 (9th Cir. 2023). "The key factor in assessing the reasonableness of attorneys' fees is the benefit to class members." *Id.* at 1002-03.

Here, Class Counsel seek 25% of the Settlement Fund (which is $2.5 million under a non-

coupon analysis).  When, as here, a settlement creates a common fund from which class member

claims are paid, "courts have discretion to employ either the lodestar method or the percentage-of-

recovery method."  *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2018 WL 4620695,

at *1 (N.D. Cal. Sept. 20, 2018) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d

935, 942).  This discretion must be exercised so as to reach a reasonable result.  *Id.*  Nevertheless,

"the percentage-of-the-fund method in common-fund cases is the prevailing practice in the Ninth

Circuit for awarding attorneys' fees."  *In re Korean Air Lines Co, Ltd. Antitrust Litig.*, No. CV 07-

05107 SJO AGRx, 2013 WL 7985367, at *1 (C.D. Cal. Dec. 23, 2013) (awarding 25% of

settlement fund in settlement which provided flight vouchers to class members); *see also Laffitte*

*v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 502 (2016) (articulating the same preference under state

law).

Most percentage-based fee awards are between 20 and 30% of the fund, and the Ninth

Circuit has established a benchmark award of 25%.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d

1043 (9th Cir. 2002).  Class Counsel here ask for this benchmark award.  The Ninth Circuit also

has enumerated a series of factors a court might consider when assessing the reasonableness of a

percentage fee award: "(1) the extent to which class counsel achieved exceptional results for the

class; (2) whether the case was risky for class counsel; (3) whether counsel's performance

generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of

law; (5) the burdens class counsel experienced while litigating the case; (6) and whether the case

was handled on a contingency basis."  *In re Optical Disk Drive*, 959 F.3d at 930 (citing *In re*

*Online DVD*, 779 F.3d at 954-55).  These factors demonstrate that a benchmark award is

reasonable here.

> ### 1.   The results achieved here, both monetary and non-monetary, justify a benchmark fee award, particularly in light of the litigation risks faced in this case.

First, the results achieved here are outstanding, and extend beyond the cash and virtual

currency available to Class Members under the Settlement.  The Settlement returns approximately

46% of class member losses back to Class Members.  Much lower recovery rates have been

deemed substantial enough to merit a benchmark award.  *See, e.g.*, *Vianu v. AT&T Mobility LLC*,

No. 19-CV-03602, 2022 WL 16823044, at *10 (N.D. Cal. Nov. 8, 2022) (finding that a settlement secured "substantial benefits" supporting a 25% fee award where it returned "about" of losses back to class members).  And Class Members with open Roblox accounts will have the Robux they are owed deposited straight into their Roblox accounts.  Structuring the relief this way allows every Class Member the opportunity to share in the Settlement Fund while also minimizing administrative costs based on evaluating claims.  The Class also received refunds of 403,335,352 Robux as an immediate result of the litigation, valued at $5,041,691.90.  *See* Dkt. 66.

These results are all the more exceptional in light of the litigation risks faced by Class Counsel and the Settlement Class.  As Roblox itself has explained, Class Members' purchasing behavior potentially belies any claim that they were defrauded, an argument that may have posed an insuperable hurdle at class certification, particularly with respect to manageability.  Moreover, Roblox raised at the pleading stage a plausible argument that Roblox users were on notice, and may even have agreed to, the moderation actions underlying this case.  These defenses could have raised serious barriers to recovery on the merits.  However, as all of the outstanding merits arguments in this case were fact-intensive, they were highly unlikely to be resolved prior to trial.  Class Counsel was willing to take on this risk, supporting the fee request.  Ultimately, Class Counsel concluded that providing Class Members a recovery now, rather than a similar recovery or perhaps no recovery after months or years of complex discovery and motions practice, served Class Members' interests by eliminating the considerable risk of continuing litigation.  *See Vizcaino*, 290 F.3d at 1048-50; *see also In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *8-9 (N.D. Cal. Apr. 24, 2019) (approving fee request based in part on the "substantial risk" class counsel incurred in litigating the action).

Next, in light of these barriers to any kind of substantial recovery, Class Counsel's decision to take this case on contingency was risky.  Class Counsel advanced initial costs, and were prepared to front significant resources to prosecute this case, including through trial and any appeals.  When Class Counsel agreed to take on this case, they understood that they might need to forego other potentially profitable work in order to litigate this case to a successful conclusion.

Finally, Class Counsel's skillful work here has generated substantial non-monetary benefits that go beyond the monetary/Robux benefits available under the Settlement.  As discussed above, the Settlement also locks in place a refund program through which Roblox users whose items are deleted by Roblox can get their Robux back.  That program was not implemented until after Plaintiff sued, and in response to this litigation in an effort to moot it.  Injunctive relief is often difficult to put a sticker price on, but valuing this relief is relatively straightforward—though it does require some calculation set forth in detail in the Declaration of Yaman Salahi filed at docket entry 66.  In short, even under conservative estimates, this relief will save Class Members as much as $31 million over the next four years, based on a conservative assumption that Roblox does not grow as a company after 2022.  *See* Dkt. 66 ¶ 10.  By any measure, this is significant.

Given the relief secured on the merits, plus the valuable injunctive relief included in the Settlement, the Court should not hesitate to find that a benchmark award of $2.5 million would fairly and reasonably compensate Class Counsel in this action.  This represents 25% of the fund, and factoring in the value of the injunctive relief, the requested award would be just 5.4% of the Settlement's value to the Class.  The award is certainly reasonable, and should be granted.

### 2.    A lodestar cross check supports the requested fee.

Though the Court need not engage in a lodestar cross-check in this case, *see Laffitte*, 1 Cal. 5th at 506; *see also Vizcaino*, 290 F.3d at 1050, such a cross-check nevertheless confirms the reasonableness of Class Counsel's requested fee award.  The lodestar method requires multiplying the hours invested in the case by counsel by a reasonable hourly rate.  This figure is then often enhanced further to account for the results achieved and the risk of nonpayment.  *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 261 (N.D. Cal. 2015).  Mathematical precision is not required for a cross-check.  And multipliers between 1 and 4 are typical in class action cases.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008).

At current hourly rates, Class Counsel and Liaison Counsel's cumulative lodestar is $815,160.00, reflecting approximately 1,172 hours of work.  Salahi Decl. ¶ 11; Reich Decl. ¶ 3. *See Vizcaino*, 290 F.3d at 1051 ("Calculating fees at prevailing rates to compensate for delay in receipt of payment was within the district court's discretion.").  The hours spent on the case are

reasonable, in light of the complexity of the case, including the issues raised on the motion to

dismiss and the difficulties encountered in settling the case.  Moreover, Class Counsel's hourly

rates are frequently approved as reasonable, and are the same rates that counsel charges to paying

clients.  *See In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 633 (N.D. Cal.

2021) (finding Edelson PC's hourly rates reasonable for their experience and locality); *id.* at Dkt.

499-3 at ¶¶ 25-33 (N.D Cal. Oct. 15, 2020) (Declaration of Professor William B. Rubenstein

finding that "the hourly rates [Edelson PC] utilize are entirely consistent with the rates judges in

[the Northern District of California] explicitly approved in overseeing class action settlements in

2019, and the average, or blended, hourly rate—while above the median—appropriately reflects

the level of lawyering required for a case of this magnitude"); *Moreno v. S.F. Bay Area Rapid

Transit Dist.*, No. 17-CV-0211-JSC, 2019 WL 343472, at *6 (N.D. Cal. Jan. 28, 2019) (finding

that Edelson PC's rates "are reasonable in light of prevailing market rates in the Bay Area.").

Given Class Counsel's lodestar, the requested fee award represents a 3.0 risk multiplier.

Such a multiplier is reasonable.  Indeed, for the reasons explained above, this Settlement

represents an outstanding result for the Settlement Class, both in terms of the monetary/Robux

relief secured but also in terms of the conduct relief Roblox has committed to.  Achieving these

risks in light of the significant hurdles to class-wide relief on the merits (*i.e.*, a significant risk of

nonpayment) fully justifies a multiplier of 3.0, which is right in light with the typical multiplier

awarded in cases of this type.

Thus, the lodestar crosscheck confirms that Settlement Class Counsel's requested fee is

reasonable.[5]

---

[5]     Plaintiff also wishes to preserve the argument that § 1712 does not foreclose the use of
the lodestar method when calculating fees in coupon settlements, and that under the lodestar
method the requested fees would be reasonable and the 3.0 multiplier amply justified for the
reasons stated above the line.  *See Smith v. Costa Del Mar, Inc.*, No. 3:18-CV-1011-TJC-JRK,
2021 WL 4295282, at *16 (M.D. Fla. Sept. 21, 2021) (finding a 2.8 multiplier justified in coupon
settlement).  Plaintiff recognizes that the argument is foreclosed Ninth Circuit precedent, *see In
re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) (holding that fees awarded under
§ 1712(a) can *only* be calculated as a percentage of redeemed coupon value, and never via the
lodestar method), but also that every other circuit to consider the question has disagreed, *see In
re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods.
Liab. Litig.*, 27 F.4th 291, 302 (4th Cir. 2022) (collecting cases from the 6th, 7th, and 8th circuits
(continued...)

1

        **C.      Settlement Class Counsel's expenses are reasonable.**

2

        In common-fund cases, the Ninth Circuit has stated that the reasonable expenses of

3   acquiring the fund can be reimbursed to counsel who has incurred the expense.  *See Vincent v.*

4   *Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Acosta v. Frito-Lay, Inc.*, No. 15-CV-

5   02128-JSC, 2018 WL 646691, at *11 (N.D. Cal. Jan. 31, 2018) ("There is no doubt that an

6   attorney who has created a common fund for the benefit of the class is entitled to reimbursement

7   of reasonable litigation expenses from that fund.") (citation omitted)).  Such expense awards

8   comport with the notion that the district court may "spread the costs of the litigation among the

9   recipients of the common benefit."  *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1121 (9th Cir.

10  2002).

11

        Here, Class Counsel and Liaison Counsel have advanced $17,732.34 in unreimbursed costs

12  related to the prosecution of this litigation.  The lion's share of these costs was the mediation fee

13  necessary to secure the services of Phillips ADR.  The remaining costs are standard costs incurred

14  in litigation, such as copying costs, travel costs, and filing fees.  Such expenses are routinely

15  approved for payment from common funds.  *See, e.g.*, *Sullivan v. Dolgen Caifornia, LLC*, No.

16  3:15-CV-01617-JD, 2017 WL 3232540, at *2 (N.D. Cal. July 31, 2017); *In re High-Tech*

17  *Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL5158730, at *16 (N.D. Cal. Sept. 2,

18  2015).

19

        **D.      The Court should issue the requested service award.**

20

        Finally, Plaintiff requests a $5,000 service award in recognition of the role her efforts

21  played in securing relief for the Settlement Class.  "[I]ncentive awards that are intended to

22  compensate class representatives for work undertaken on behalf of a class are fairly typical in

23  class action cases."  *In re Online DVD*, 779 F.3d at 943 (citation omitted).  Such awards "are

24  intended to compensate class representatives for work done on behalf of the class, to make up for

25  financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their

26

27  _____

28  disagreeing with *HP Inkjet* and siding against *HP Inkjet*).  In the event the Court concludes that
    this is a coupon settlement but has concerns about calculating the redemption rate, Plaintiff
    suggests that the lodestar method (which is accepted for coupon settlements in every other circuit
    to consider the question) also would support the requested fee.

willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  "Service awards as high as $5,000 are presumptively reasonable in this judicial district."  *Juarez v. Social Fin., Inc.*, No. 20-CV-03386-HSG, 2023 WL 3898988, at *8 (N.D. Cal. June 8, 2023).  But courts still must scrutinize such awards to ensure that they do not undermine the adequacy of the named plaintiff. *See id.*

The circumstances of this case show that a $5,000 award is reasonable here.  Plaintiff is a minor child, and the decision to serve as a named plaintiff is significantly weightier for someone of that age, who likely has not been subjected to the type of scrutiny that comes with federal litigation, and who ran the risk of retaliation by Roblox through termination of her accounts and having the case associated with herself throughout adulthood.  *See generally* Dennis Decl.  And even though this case settled in relatively early stages, Plaintiff already has been active in the litigation, helping counsel to investigate the case, and respond to Roblox's arguments about the refund program it introduced after the complaint was filed.  *Id.* ¶ 3 (describing over 90 hours of work in support of the litigation).  Moreover, Plaintiff exposed herself to public scrutiny and commentary, a big risk for an impressionable young girl.  *Id.* ¶ 4.  And, ultimately, the incentive award would constitute a mere 0.05% of the Settlement Fund, a much smaller proportion than awards approved in other cases.  *See, e.g.*, *In re Online DVD*, 779 F.3d at 948 (approving as reasonable $5,000 incentive awards to multiple plaintiffs and noting that the combined awards "make[] up a mere 0.17% of the total settlement fund").

## IV.    CONCLUSION

In sum, the Court should find that the instant Settlement is not a coupon settlement, award 25% of the fund in attorneys' fees, and issue a $5,000 service award to the Class Representative.

Date: July 27, 2023                      By: */s/ Yaman Salahi*

                                                Rafey Balabanian SBN 315962)
                                                rbalabanian@edelson.com
                                                Yaman Salahi (SBN 288752)
                                                ysalahi@edelson.com
                                                EDELSON PC
                                                150 California Street, 18th Floor
                                                San Francisco, California 94111

1
2

Tel: 415.212.9300
Fax: 415.373.9435

3

Jay Edelson (*pro hac vice*)
jedelson@edelson.com

4

J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com

5

EDELSON PC
350 North LaSalle St., 14th Floor

6

Chicago, Illinois 60654
Tel: 312.589.6370

7

Fax: 312.589.6378

8
9

*Settlement Class Counsel*

10

Mark S. Reich (*pro hac vice*)
mreich@zlk.com

11

Courtney E. Maccarone (*pro hac vice*)
cmaccarone@zlk.com

12

Levi & Korsinsky LLP
55 Broadway

13

4th Floor, Suite 427
New York, NY 10006

14

212-363-7500
Fax: 212-363-7171

15
16

*Settlement Liaison Counsel*

17
18
19
20
21
22
23
24
25
26
27
28